UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DEBORAH DONOGHUE *and*
MARK RUBENSTEIN,

                              Plaintiffs,

                    -v-

OAKTREE SPECIALTY LENDING CORP.,

                              Nominal Defendant,

*and* LEONARD M. TANNENBAUM,

                              Defendant.

---

21 Civ. 4770 (PAE)

OPINION &
ORDER

PAUL A. ENGELMAYER, District Judge:

        In this derivative action, shareholders of Oaktree Specialty Lending Corporation

("OCSL") bring suit to recover alleged short-swing profits obtained by a company insider,

Leonard Tannenbaum, pursuant to Section 16(b) of the Securities Exchange Act of 1934 (the

"Act"), 15 U.S.C. § 78p(b) ("§ 16(b)").

        Plaintiffs Deborah Donoghue and Mark Rubenstein, who own stock in OCSL, allege that

Tannenbaum, a statutory insider of both OCSL and Oaktree Strategic Income Corporation

("OCSI"), unlawfully realized short-swing profits when he (1) voted in favor of OCSI's merger

into OCSL (the "Merger"), causing his OCSI shares to be exchanged for OCSL shares at a ratio

of which he had advance inside knowledge, and then, (2) within six months of the Merger, sold

OCSL shares on the open market, at a profit.  Tannenbaum counters that his acquisition of OCSL

shares pursuant to the Merger was exempt from § 16(b) under the "unorthodox transaction"

doctrine, because he did not have volition over how to vote on the Merger and did not have

access to exploitable inside information.  Crucially, he asserts, he had been instructed by non-party Oaktree Capital Management, L.P. ("Oaktree") to vote his shares in favor of the Merger pursuant to a valid voting agreement, thereby leaving him no discretion over how to vote.

After the Court determined that it could not resolve this dispute on the pleadings, the parties conducted discovery on the limited issue whether the elements for exemption under the "unorthodox transaction" doctrine are established, as Tannenbaum claims.  With discovery now complete, the parties have cross-moved for summary judgment.  For the reasons that follow, the Court grants Tannenbaum's motion and denies plaintiffs' mirror-image motion.

## I.    Background

### A.    Factual Background[1]

#### 1.    The Parties and Other Relevant Entities

Nominal defendant OCSL, a management investment company, is a Delaware corporation whose common stock is registered under § 12(b) of the Act and traded on the NASDAQ Stock Market LLC.  Pl. 56.1 ¶ 3; Dkt. 46-20 ("OCSL Form 8-K") at 1.

Non-party OCSI is a Delaware corporation whose stock was registered under § 12(b) of the Act and traded on the NASDAQ Stock Market LLC.  Dkt. 46-19 ("OCSI Form 8-K") at 1.

Non-party Oaktree, which arranged the Merger, is an investment company which beneficially owned 13.2% of OCSL's shares and 22.9% of OCSI's shares immediately prior the Merger.  Pl. 56.1 ¶¶ 6, 8.

---

[1] The Court draws its account of the facts from the parties' submissions on summary judgment, including their Rule 56.1 statements, Dkts. 48 ("Pl. 56.1"), 65 ("Def. 56.1"); Rule 56.1 counterstatements, Dkts. 52 ("Def. Counter 56.1"), 53 ("Pl. Counter 56.1"); the declarations of James A. Hunter, Dkts. 46 ("Hunter Decl. I"), 54 ("Hunter Decl. II"); Derek Borchardt, Dkt. 51 ("Borchardt Decl."); Jeffrey A. Udell, Dkt. 63 ("Udell Decl."); and Tannenbaum, Dkt. 64 ("Tannenbaum Decl."); and the exhibits attached thereto.

Defendant Tannenbaum is an individual who beneficially owned 13% of OCSL's shares and 21.6% of OCSI's shares immediately before the March 2021 Merger, and 14.9% of OCSL's shares immediately after the Merger. *Id.* ¶¶ 5, 7.

Plaintiffs Donoghue and Rubenstein are individuals who, at all relevant times, owned securities in OCSL. *Id.* ¶ 39.

### 2.   July 13, 2017: Tannenbaum Sells a Controlling Interest in OCSL's And OCSI's Predecessors to Oaktree

Tannenbaum founded, and held a controlling interest in, the investment companies Fifth Street Senior Floating Rate Corp. ("Fifth Street Senior") and Fifth Street Finance Corp. ("Fifth Street Finance"). Pl. Counter 56.1 ¶¶ 3–4. On July 13, 2017, pursuant to an Asset Purchase Agreement (the "APA"), the two companies agreed to sell, to Oaktree, their management right in the funds under their management and certain other interests. *Id.* ¶ 4; Pl. 56.1 ¶ 12. The sale closed in October 2017. Pl. 56.1 ¶ 12. To reflect their new brand, Fifth Street Senior changed its name to Oaktree Strategic Income Corporation ("OCSI"), and Fifth Street Finance changed its name to Oaktree Specialty Lending Corporation ("OCSL"). Def. 56.1 ¶¶ 3–4. Tannenbaum continued to be a shareholder in OCSI and OCSL, but, under the APA, ceded certain rights and authorities with respect to his shares to Oaktree. *Id.* ¶ 6; Pl. Counter 56.1 ¶ 5. These restrictions, designed to ensure that Tannenbaum would not exercise unwanted influence over OCSI and OCSL, were set out in two identical voting agreements (the "Voting Agreements"). Def. 56.1 ¶¶ 6–7, 12.

### 3.   The Voting Agreements

The terms of the Voting Agreements were as follows. As to voting his shares:

- Tannenbaum was to appear at every OCSL and OCSI shareholder meeting and vote his shares in accordance with Oaktree's "written instruction[s]." Dkt. 63-3 ("OCSL VA") § 2.01(a)(ii); Dkt. 63-4 ("OCSI VA") § 2.01(a)(ii).

- However, where Oaktree failed to provide written instructions directing Tannenbaum to vote his shares on any specific proposal pursuant to § 2.01(a)(ii), Tannenbaum retained the authority to vote his shares freely.  OCSL VA § 2.02(a); OCSI VA § 2.02(a); *see* Pl. Counter 56.1 ¶ 8.b; Def. 56.1 ¶ 18.

- Subject to limited exceptions, Tannenbaum was prohibited from entering into voting agreements, proxies, or similar voting arrangements with any party other than Oaktree, unless Oaktree had given prior written consent.  OCSL VA § 2.03(a); OCSI VA § 2.03(a).

As to his ability to exercise potential control over OCSL's or OCSI's management, the Voting Agreements prohibited Tannenbaum from:

- Acquiring a beneficial ownership interest in, or rights to acquire, voting securities in OCSL/OCSI.  OCSL VA § 2.07(a); OCSI VA § 2.07(a).

- Seeking to propose to influence or control OCSL's/OCSI's management or policies. OCSL VA § 2.07(b); OCSI VA § 2.07(b).

- Requesting that Oaktree waive, terminate, or amend any of Tannenbaum's restrictions on participating in OCSL's/OCSI's management.  OCSL VA § 2.07(h); OCSI VA § 2.07(h).

The Voting Agreements further restricted Tannenbaum's ability to sell his OCSL/OCSI shares in the open market.  Specifically, Tannenbaum:

4

- Could not transfer shares without OCSL's/OCSI's prior written consent. OCSL VA §
  2.03(a); OCSI VA § 2.03(a).

- Could not sell more than 1% of his outstanding OCSL/OCSI shares in any 45-day
  period. OCSL VA § 2.03(b); OCSI VA § 2.03(b).

- Had to offer OCSL/OCSI a right of first refusal over all proposed transactions of their
  shares on the open market. OCSL VA § 2.03(c); OCSI VA § 2.03(c).

The Voting Agreements are filed with the SEC and publicly available. *See* OCSI VA
(displaying URL at bottom of each page linking to SEC archive); OCSL VA (same); *see also*
Dkt. 42 at 4–5, 7 (parties so agreeing).

### 4. October 28–29, 2020: The Proposed Merger and Oaktree's Disclosures

On October 28, 2020, OCSI and OCSL entered into an agreement to merge, with OCSL
to be the surviving entity (the "Merger"). Def. 56.1 ¶¶ 18–19; *see* Dkt. 63-1 Annex A ("Merger
Agreement"). In the Merger Agreement, OCSI's and OCSL's boards of directors recommended
that their respective shareholders approve the proposed Merger. Merger Agreement at A-1.

On October 29, 2020, OCSI and OCSL publicly announced the proposed Merger
through, *inter alia*, a joint press release, an investor presentation, and public SEC filings by
OCSI and OCSL. Def. 56.1 ¶ 24. As consideration for the proposed Merger, OCSI shareholders
were offered OCSL shares in exchange for their OCSI shares. *Id.* ¶¶ 21–22. In their joint press
release, OCSI and OCSL explained that the exchange ratio of OCSI shares to OCSL shares
would be derived from the ratio between the two funds' net asset values ("NAVs") at the time of

the Merger's closing. Dkt. 46-17 ("Press Release") at 1[2]; *see also* Dkt. 46-16 item 1.01 (OCSL

Form 8-K, filed with the SEC on October 29, 2020, setting forth same calculation method and

specifying that the final NAVs would be calculated no sooner than 48 hours before the Merger's

closing). As an illustrative example to clarify the exchange ratio's prospective calculation, the

Press Release stated that, based on the companies' NAVs as of June 30, 2020, each OCSI share

would be converted into approximately 1.39 OCSL shares. Press Release at 1. In the Press

Release, Mathew Pendo ("Pendo"), President and Chief Operating Officer of OCSL[3] and OCSI,

announced that "[w]e are thrilled to announce this merger," and touted its financial advantages to

both sets of shareholders. *Id.* The Press Release announced that an investor conference call

would take place that same day, provided the dial-in information, and announced that a joint

proxy statement would be filed with the SEC and mailed to all OCSI and OCSL stockholders.

*Id.* at 2–3.

Tannenbaum declares—and plaintiffs do not dispute—that he first learned of the

proposed Merger through those public announcements. Pl. Counter 56.1 ¶¶ 24–25.

### 5.    Tannenbaum's Phone Call with Mathew Pendo

At his deposition, Tannenbaum testified that, upon learning that the proposed Merger had

been publicly announced, he called Pendo at some point between October 30 and November 1,

---

[2] Plaintiffs concede that "[t]o calculate the exchange ratio, the funds simply divided OCSI's NAV per share by OCSL's NAV per share." Pl. Counter 56.1 ¶ 25.

[3] Plaintiffs are unspecific as to Pendo's precise titles. *See* Pl. 56.1 ¶ 33 (Pendo president and COO of "the funds[]"); *id.* ¶ 34 (Pendo president of OCSL and OCSI); Dkt. 49 ("Pl. SJ Mem.") at 10 (Pendo president and COO of "all the Oaktree entities"; *id.* (Pendo president and CEO of unspecified entities). Relevant here, it appears undisputed that (1) Pendo, at a minimum was president and COO of OCSL, and (2) Pendo was in a position to give valid "written instruction" on behalf of Oaktree under the Voting Agreements. *See* OCSL VA § 2.01(a)(ii); OCSI VA § 2.01(a)(ii).

2020. Dkt. 46-8 ("Tannenbaum Dep. Tr.") at 48–49; *see also* Pl. 56.1 ¶ 33. As a large shareholder in both OCSI and OCSL, Tannenbaum was "concerned and curious," Tannenbaum Dep. Tr. at 50, and wished to understand how both companies' NAVs would be calculated to "ascertain if [he] was being hurt [or] benefitted" by the stock conversion pursuant to the Merger, *id.* at 47. In response, "Pendo pointed towards different parts of the public release documents to walk [Tannenbaum] through" the method of calculation. *Id.* at 48. Tannenbaum testified that he understood that any present calculations would not be final, as they depended on the companies' NAVs at the time of the Merger's closing. *Id.* at 49. He further testified that Oaktree had a reputation for "put[ting] out the right book value" for the NAVs, *id.* at 50, and that he consulted independent analyst reports on OCSI and OCSL, *id.* at 51.

The parties agree that Pendo had at least some inside information related to the Merger. Def. Counter 56.1 ¶ 34. But according to Tannenbaum's testimony, which the evidence adduced has not specifically contravened, he and Pendo were scrupulous to discuss public information only. Tannenbaum Dep. Tr. at 51.

6.   **January 21 and February 4, 2021: Oaktree's Joint Proxy Materials And OCSL's Quarterly Report**

On January 21, 2021, OCSI and OCSL filed joint proxy materials with the SEC as to the proposed Merger. Pl. 56.1 ¶ 27; *see* Dkt. 46-7 ("Joint Proxy Mat."). These announced that an OCSL shareholder meeting was scheduled for March 15, 2021, at 10 a.m. Pacific Time, and that an OCSI shareholder meeting was scheduled for half an hour later. Joint Proxy Mat. at 1.[4]

The Joint Proxy Materials set out three voting items for the OCSL shareholder meeting:

(i)   electing two new OCSL directors ("Director Proposal");

---

[4] Due to the inconsistently numbered pages within the exhibit, the page cites used here for this exhibit refer to the pagination superimposed by ECF. The same is so for the exhibit at Dkt. 63-5.

(ii)    ratifying the appointment of Ernst & Young LLP as an independent auditor for

OCSL for the fiscal year ending September 30, 2021 ("Auditor Proposal"); and

(iii)    approving the issuance of OCSL common stock, pursuant to the October 28, 2020

proposed Merger agreement, which was necessary to pay for the OCSI shares to be

acquired in the Proposed Merger ("Merger Stock Issuance Proposal"). Def. 56.1 ¶ 29;

*see* Joint Proxy Mat. at 5, 116–20 (summarizing and setting forth OCSL-related

proposals).

The Joint Proxy Materials set out one voting item for the OCSI shareholder meeting:

(i)    voting in favor of the proposed Merger. Joint Proxy Mat. at 7, 121.

For the proposed Merger to succeed, it was necessary that a majority of OCSL votes cast

and a majority of all OCSI outstanding shares voted in its favor, and that certain other closing

conditions be met. Def. 56.1 ¶¶ 19–20; Pl. Counter 56.1 ¶ 28 (citing Joint Proxy Mat. at 120–

21).[5] Thus, the proposed Merger depended on a favorable shareholder vote on both the Merger

Stock Issuance Proposal and the Merger Proposal. Def. 56.1 ¶ 30; Joint Proxy Mat. at 120–21.

On February 4, 2021, OCSL filed a Form 8-K with the SEC detailing its financial results

for the fourth quarter of 2020. *See* Dkt. 63-5 at 5. The filing contained an earnings presentation

for the first quarter of fiscal year 2021 which, *inter alia*, discussed the proposed Merger. *Id.* at

17, 32. There, OCSL provided an updated illustrative example of the projected OCSI–OCSL

share exchange ratio—by then, 1.37—based on the two companies' NAV ratio as of December

31, 2020. *Id.* at 32.

---

[5] These 14 conditions, set forth in the Merger Agreement, related to due diligence and SEC
regulatory requirements. *See* Merger Agreement at A-42–A-54. None are relevant to this case.

7.    **February 8, 2021: Oaktree Instructs Tannenbaum to Vote His Shares**

On February 8, 2021, Robyn Tannenbaum, Tannenbaum's wife, emailed Pendo about the upcoming OCSL–OCSI shareholder votes. Def. 56.1 ¶¶ 31–32. Her email stated: "We have received [Tannenbaum]'s control numbers to vote his shares in the merger. Per our voting agreement, please let us know how you would like us to vote." Dkt. 64 ("Tannenbaum Decl.") Ex. A. That same day, Pendo replied: "Please vote in favor of all 3 proposals." *Id.* (collectively, the "February 8 Emails"). Robyn Tannenbaum later, on Tannenbaum's behalf, voted in favor of all four voting items at the OCSL and OCSI shareholder meetings. Pl. Counter 56.1 ¶ 36.

8.    **March 15, 2021: Tannenbaum's Vote and Shareholders' Approval of The Merger**

On March 15, 2021, the proposed Merger cleared both OCSI's and OCSL's shareholder votes. Of the OCSL shareholder votes cast, approximately 81.2 million voted in favor of the Merger Stock Issuance Proposal, while 2.1 million voted against it or abstained. Def. 56.1 ¶ 39. Of OCSI's approximately 29.5 million total outstanding shares, approximately 18.9 million voted in favor of the proposed Merger, while 200,000 voted against it or abstained. *Id.* ¶ 38; Pl. 56.1 ¶ 30. Of the 18.9 million favorable OCSI votes, approximately 6.36 million were cast by Tannenbaum. Pl. 56.1 ¶ 30. Without his vote in favor, only 12.54 million OCSI shares would have approved the Merger—short of the required majority of OCSI's 29.5 million outstanding shares. *Id.* ¶ 31.

On March 19, 2021, the Merger closed. Def. 56.1 ¶ 40. The final stock exchange ratio was 1.3371 OCSL shares per OCSI share. *Id.*; *see* Dkt. 63-8 item 2.01 (SEC Form 8-K setting forth final ratio). Under that ratio, Tannenbaum acquired approximately 8.35 million OCSL shares in exchange for his 6.36 million OCSI shares. Pl. 56.1 ¶ 35; Def. 56.1 ¶ 41. (citing

Tannenbaum Decl. ¶ 16).  Post-Merger, Tannenbaum beneficially owned 14.9% of OCSL's

shares.  Pl. 56.1 ¶ 5.  In total, OCSL issued approximately 39.4 million new shares in exchange

for OCSI shares.  *Id.* ¶ 32.

### 9.    Tannenbaum's Holdings of OCSI and OCSL Shares, and Sales of OCSL Shares Within § 16(b) Statutory Window

From the closing of the APA on July 13, 2017 through the closing of the Merger on

March 19, 2021, Tannenbaum continually held shares in both OCSI and OCSL.  Def. 56.1 ¶ 1.

Between October 2017, when his Fifth Street entities were renamed OCSL and OCSI, and May

27, 2021, the commencement of this suit, Tannenbaum repeatedly sold OCSL shares on the open

market.  *See* Dkt. 63-10 (SEC Form 4 filed by Tannenbaum, showing continual transactions

marked "S" for "sale" and continual decrease in overall OCSL shares held by Tannenbaum).[6]

Relevant here, within the statutory six-month window before and after the closing of the

Merger,[7] Tannenbaum sold 4,704,822 OCSL shares, Def. Counter 56.1 ¶ 36 (citing Tannenbaum

Form 4), for a purported profit of $1,076,059.86, *id.* ¶ 37; *see also* Pl. 56.1 Annex A (setting

forth sales in detail).

### B.    Procedural Background

On May 27, 2021, Donoghue filed the original complaint.  Dkt. 1.  On July 15, 2021,

Tannenbaum moved to dismiss.  Dkt. 17.  On August 5, 2021, Donoghue filed an amended

complaint.  Dkt. 23 ("AC").  On August 24, 2021, Tannenbaum moved to dismiss the AC and

filed a memorandum of law ("MTD"), two declarations, and exhibits in support.  Dkts. 25–28.

The MTD argued that Tannenbaum's acquisition of OCSL shares pursuant to the Merger had

---

[6] Between October 2017 and the Merger's closing, Tannenbaum's holdings in OCSL decreased from more than 25 million shares to approximately 16 million shares.  *See* Dkt. 63-10 at 2–64.

[7] Tannenbaum ceased selling OCSL shares on June 1, 2021, shortly after this lawsuit was filed. Pl. 56.1 at A-2.

been an "unorthodox transaction" and was exempt from § 16(b). In support, the MTD appended various SEC forms, the Voting Agreements, and the February 8 Emails. On September 3, 2021, Donoghue filed an opposing memorandum of law. Dkt. 29 ("MTD Opp'n"). On September 10, 2021, Tannenbaum filed a reply. Dkt. 30.

On October 12, 2021, the Court held an initial conference. *See* Dkts. 37, 42 ("Conf. Tr."). The parties there agreed that the dispositive factual issue in determining whether the unorthodox transaction exemption was established, so as to warrant dismissal, was whether Oaktree had indeed instructed Tannenbaum to vote both his OCSL shares and OCSI in favor of the proposed Merger, thereby binding his votes under the Voting Agreements. The parties agreed that the February 8 Emails were crucial, and potentially dispositive, evidence as to that issue.[8] Conf. Tr. at 12–18. However, plaintiffs, rightly, contested whether the February 8 Emails—which were neither attached to, nor incorporated by reference into the AC—were cognizable on a motion to dismiss.[9] *Id.* at 3–20. With the Court's encouragement, the parties

---

[8] At the end of the conference, plaintiffs suggested, for the first time, that the Voting Agreements might be invalid, thus calling into doubt whether Tannenbaum's votes had been bound. Conf. Tr. at 34–38. In moving for summary judgment, plaintiffs did not pursue this argument.

[9] On a motion to dismiss, "[c]ourts are permitted to take judicial notice 'of documents that are "integral to the complaint"' and 'of materials in the public record . . . for the limited purpose of noting what the documents state, rather than to prove the truth of their contents.'" *Ganske v. Mensch*, 480 F. Supp. 3d 542, 546 (S.D.N.Y. 2020) (quoting *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 462 (S.D.N.Y. 2020)). And "[w]here public documents filed with the Securities and Exchange Commission (SEC) are attached to a defendant's motion to dismiss, a court may consider them without converting a motion to dismiss into a summary judgment motion." *Ashland Inc. v. Morgan Stanley & Co.*, 700 F. Supp. 2d 453, 461 n.4 (S.D.N.Y. 2010), *aff'd*, 652 F.3d 333 (2d Cir. 2011). At the conference, the parties agreed that Tannenbaum's attached SEC Forms 4 and Forms 8-K, and publicly filed Voting Agreements were cognizable. Conf. Tr. at 3–9. The February 8 Emails, however, were of a different character, being neither public documents nor otherwise cognizable on the complaint. And where "a party 'introduces matter extraneous to the pleadings, the Court must convert the motion to dismiss into a motion for summary judgment or exclude the extraneous documents from

agreed to conduct limited discovery on the issue, with the understanding that the Court would convert the pending motion to dismiss into one for summary judgment. *Id.* at 21–33.

On October 15, 2021, the Court approved a joint discovery plan as to that limited issue, converted Tannenbaum's motion to dismiss into a motion for summary judgment,[10] set a briefing schedule, and stayed all other discovery. Dkt. 39. On December 1 and 2, 2021, the parties filed cross-motions for summary judgment, memoranda of law, declarations, and affidavits in support, and Rule 56.1 statements. Dkts. 44–49, 61–65 (corrected filings December 29, 2021). On December 15, 2021, the parties filed their opposing briefs, supporting declarations, and 56.1 counterstatements. Dkts. 50–55, 56, 67 (corrected filings December 29, 2021). On December 22, 2021, the parties filed their replies. Dkts. 59–60, 66 (corrected filing December 29, 2021).

## II.     Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of proving the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

---

consideration.'" *Discover Grp., Inc. v. Lexmark Int'l, Inc.*, 333 F. Supp. 2d 78, 82 (E.D.N.Y. 2004) (quoting *AIM Int'l Trading, L.L.C. v. Valcuine S.p.A.*, No. 02 Civ. 1363 (KPL), 2003 WL 21203503, at *3 (S.D.N.Y. May 22, 2003)).

[10] Such a conversion is customarily done when "summary judgment can be granted and adequate notice has been given to make the conversion fair." *In re WorldCom, Inc. Sec. Litig.*, 382 F. Supp. 2d 549, 556 (S.D.N.Y. 2005). Both conditions are met here. The parties agreed at the conference that summary judgment litigation would be proper provided the Court granted their plan for limited discovery. And the Court stated that, upon completion of such discovery, it expected to convert Tannenbaum's motion to dismiss into one for summary judgment. Conf. Tr. at 32–33.

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted) (alteration omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[11] In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III. Discussion

### A. Applicable Legal Framework

#### 1. Section 16(b) of the Securities Exchange Act of 1934

Section 16 of the Act "was enacted to prevent corporate insiders from using non-public information to 'speculate in the stock of the corporations to which they owe a fiduciary duty.'" *Donoghue v. Centillium Commc'ns, Inc.*, No. 05 Civ. 4082 (WHP), 2006 WL 775122, at *2 (S.D.N.Y. Mar. 28, 2006) (quoting S. Rep. No. 73-1455, at 68 (1934)). The statute compels the "disgorgement to the company of any profit derived from the matching of any purchase and any

---

[11] Here, as discussed, the parties confined discovery to the issues on which all agreed liability turned. *See* Conf. Tr. 21–33.

sale of an 'equity security' (other than an exempted security) within a six-month period by a statutory insider." *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998). Either the issuer or (as here) a shareholder acting derivatively on the issuer's behalf may bring a lawsuit under section 16(b). *Id.*

To establish liability under section 16(b), a plaintiff must prove "that there was (1) a purchase and (2) a sale of securities (3) by [an insider] (4) within a six-month period." *Id.* "The statutory definitions of 'purchase' and 'sale' are broad and, at least arguably, reach many transactions not ordinarily deemed a sale or purchase." *Kern Cnty. Land Co. v. Occidental Petrol. Corp.*, 411 U.S. 582, 593–94 (1973) ("*Kern County*"). "An insider is either (1) a beneficial owner of more than 10% of any class of non-exempt equity security, (2) a director of the issuer of any such security, or (3) an officer of the issuer." *Chechele v. Laubies*, 527 F. Supp. 3d 526, 530 (S.D.N.Y. 2021) (citing 15 U.S.C. § 78p(a)(1)). The date for when liability attaches under section 16(b) is the date when the insider "incur[s] an irrevocable obligation" to purchase or sell shares for "precise consideration." *DiLorenzo v. Murphy*, 443 F.3d 224, 229 (2d Cir. 2006).

As the statutory elements reflect, section 16(b) imposes strict liability. It imposes a blanket ban on short-term trading by insiders without regard to whether the insider in fact had— or acted upon—inside information. *See Rubenstein v. Int'l Value Advisers, LLC*, 363 F. Supp. 3d 379, 388–89 (S.D.N.Y. 2019), *aff'd*, 959 F.3d 541 (2d Cir. 2020). The statute thus aims "to remove any temptation for insiders to engage in transactions which 'may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information.'" *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320 (2d Cir. 1998) (quoting *Kern Cnty.*, 411 U.S. at 594). "No showing of actual misuse of inside

information or of unlawful intent is necessary to compel disgorgement.  Section 16(b) operates

mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and

bypassing corrupt insiders who skirt the letter of the prohibition." *Id.* at 320–21 (citation

omitted).

### 2.    Unorthodox Transactions

Not all transactions fall under section 16(b)'s broad sweep.  "In limited circumstances,

[courts] scrutinize 'borderline' or 'unorthodox' transactions 'pragmatic[ally]' to determine

whether they serve as a 'vehicle for . . . the realization of short-swing profits based upon access

to inside information.'" *Huppe v. WPCS Int'l Inc.*, 670 F.3d 214, 218 (2d Cir. 2012) (quoting

*Kern Cnty.*, 411 U.S. at 593–94 & n.26) (collecting cases).  "[T]he term [unorthodox transaction]

'has been applied to stock conversions, exchanges pursuant to mergers and other corporate

reorganizations, stock reclassifications, and dealings in options, rights, and warrants.'" *Microbot*

*Med., Inc. v. Mona*, No. 19 Civ. 3782 (GBD) (RWL), 2021 WL 1192110, at *3 (S.D.N.Y. Mar.

30, 2021) (quoting *Kern Cnty.*, 411 U.S. at 593 n.24), *appeal dismissed* (Aug. 9, 2021).

*Kern County*'s pragmatic exception to automatic liability for unorthodox transactions,

however, exempts such a transaction only if it "is 'an [1] involuntary transaction by an insider'

and that insider '[2] ha[d] no access to inside information.'" *Analytical Survs., Inc. v. Tonga*

*Partners, L.P.*, 684 F.3d 36, 45–46 (2d Cir. 2012), *as amended* (July 13, 2012) (quoting *Huppe*,

670 F.3d at 218–19) (third alteration added).  The Second Circuit "has strictly limited the *Kern*

*County* exception to its facts, excluding from liability under Section 16(b) only the 'atypical

insider' who 'lacked access to inside information' and whose 'shares were sold involuntarily.'"

*Olagues v. Perceptive Advisors LLC*, 902 F.3d 121, 129 (2d Cir. 2018) (quoting *At Home Corp.*

*v. Cox Comms., Inc.*, 446 F.3d 403, 408 (2d Cir. 2006)).  This inquiry aims to ascertain whether

the unorthodox transaction "lend[s] itself to the types of speculative abuse that the [Securities

Exchange Act] was designed to prevent." *Kern Cnty.*, 411 U.S. at 594 n.26.

**B.      Analysis**

**1.      Applicability of the Unorthodox Transaction Doctrine to Tannenbaum's Acquisition of OCSL Shares Pursuant to the Merger**

The parties disagree only as to whether the "purchase" element of § 16(b) is established

here.  They agree that (1) OCSL's shares are non-exempt securities under § 16(b); (2)

Tannenbaum was a statutory insider of OCSL, as he beneficially owned more than 10% of its

stock at all relevant times, Pl. 56.1 ¶ 5; Def. 56.1 ¶ 2; (3) Tannenbaum made "sales" of OCSL

stock when he exchanged them for cash on the open market; and (4) the sales challenged here

occurred within six months before and after he had acquired OCSL shares pursuant to OCSI's

Merger into OCSL.  These elements must be resolved in plaintiffs' favor.  The only disputed—

and therefore the dispositive—issue is whether Tannenbaum's acquisition of OCSL shares

pursuant to the Merger qualified as a "purchase" under section 16(b).

As to that issue, the parties further agree that Tannenbaum's acquisition of OCSL shares

pursuant to the Merger of OCSI into OCSL qualifies as an unorthodox transaction, such that

Tannenbaum's liability under § 16(b) must be analyzed under *Kern County*'s pragmatic two-

prong approach.  *See generally* Dkt. 49 ("Pl. SJ Mem.") (briefing only this issue); Dkt. 62 ("Def.

SJ Mem.") (same).  That assessment is clearly correct.  *See Kern Cnty.*, 411 U.S. at 593 n.24

(stock exchange pursuant to merger was unorthodox transaction); *Heublein, Inc. v. Gen. Cinema

Corp.*, 722 F.2d 29, 30–31 (2d Cir. 1983) (involuntary exchange of stock by statutory insider for

shares in the survivor of a corporate merger not prohibited by § 16(b)); *Colan v. Mesa Petroleum

Co.*, 951 F.2d 1512, 1523 (9th Cir. 1991), *as amended on denial of reh'g* (Dec. 23, 1991) ("The

majority of the transactions which have been considered 'unorthodox' within the narrow

exception announced in *Kern County* involve exchanges of stock pursuant to a merger." (collecting cases)).

The parties' cross-motions for summary judgment thus turn on two issues: whether (1) Tannenbaum's merger-related acquisition of OCSL shares was involuntary, and (2) Tannenbaum lacked access to exploitable inside information. To ultimately prevail, Tannenbaum must carry the day on both of these prongs, and plaintiffs must establish one. On summary judgment, the Court can resolve these questions only if there is no material dispute of fact as to either.

### 2.    Involuntariness

"An exchange pursuant to a merger is 'involuntary' under the *Kern County* analysis where the party making the exchange has an 'utter inability . . . to control the course of events.'" *Heublein, Inc. v. Gen. Cinema Corp.*, 559 F. Supp. 692, 699 (S.D.N.Y.), *aff'd*, 722 F.2d 29 (2d Cir. 1983) (quoting *Am. Standard, Inc. v. Crane Co.*, 510 F.2d 1043, 1054 (2d Cir. 1974)). *See also Sprague Elec. Co. v. Mostek Corp.*, 488 F. Supp. 842, 845 (N.D. Tex. 1980) ("Case law establishes a stiff test of voluntariness. So long as the seller retains any degree of control over a transaction, its actions will not be found to be involuntary."). Whether some measure of control existed is a question of fact. *Nat'l Westminster Bancorp N.J. v. Leone*, 702 F. Supp. 1132, 1139 (D.N.J. 1988).

Here, Tannenbaum argues that the evidence establishes he lacked any inability to control the outcome of the Merger. That is because, he asserts, Oaktree had exercised its authority under the Voting Agreements to direct Tannenbaum's votes, by instructing him in writing to vote his OCSI and OCSL shares in favor of the Merger at the OCSL and OCSI shareholder meetings on March 15, 2021.

The evidence indeed conclusively so establishes.

As plaintiffs acknowledge, to the extent that Tannenbaum had received "written instruction" from Oaktree to vote his shares in favor of the proposed Merger, his vote was contractually bound under the Voting Agreements, making the acquisition of OCSL shares pursuant to that Merger involuntary under *Kern County*. *See* Pl. SJ Mem. at 15; *see also* Def. SJ Mem. at 14. Plaintiffs also acknowledge, as is undisputable, that, in the February 8 Emails, Pendo expressly instructed Robyn Tannenbaum, Tannenbaum's wife, who was authorized to vote on his behalf, *see* OCSL VA § 2.03(a), OCSI VA § 2.03(a), to "[p]lease vote in favor of all 3 proposals" at the March 15, 2021 shareholder meetings. February 8 Emails; Pl. SJ Mem. at 15; *see also* Def. 56.1 ¶ 32. It is thus undisputed that Tannenbaum's vote was contractually bound—and involuntary—as to the proposals to which Pendo's email instructed him to vote in favor.

Plaintiffs' central argument is that in fact there were four proposals on which Tannenbaum's vote was necessary—the three presented to OCSL shareholders on March 15, 2021 (the Director Proposal, the Auditor Proposal, and the proposal to approve the Merger) and the one presented to OCSI shareholders the same day (the proposal to approve the merger). On plaintiffs' reading, because Pendo's February 8 email did not address all four proposals on which Tannenbaum's had authority to vote, but directed a yes vote only as to "all 3," Tannenbaum must have retained agency as to a fourth proposal. Pl. SJ Mem. at 10–11, 16.[12] And provided that the vote on which he retained discretion concerned whether to approve the Merger—either from the OCSI or OCSL direction—Tannenbaum, particularly given his substantial shareholdings, had at least some ability to control the Merger's outcome.

---

[12] Pl. SJ Mem. at 15–16; *see* Joint Proxy Mat. at 101–05 (numbering such proposals "OCSL Proposal 1" through "OCSL Proposal 3" and titling third proposal as "Approval of the Merger Stock Issuance Proposal"); *id.* at 106 (setting forth separate proposal titled "OCSI Proposal 1 — Approval of the Merger Proposal").

Tannenbaum counters that there is no evidence supporting plaintiffs' theory other than their interpretation of the February 8 Emails. And, he argues, plaintiffs misconstrue these. There were, he asserts, only three proposals: the Director Proposal, the Auditor Proposal, and the proposed Merger of OCSL into OCSI. Def. SJ Mem. at 13. Had there been more than three proposals, Tannenbaum argues, the email instructing him would have necessarily had to state on *which* three Oaktree was instructing Tannenbaum how to vote. *Id.* at 13–14. Support for this, Tannenbaum notes, is that the email told him to vote yes on "all 3 proposals"—as opposed, say, "3 of the proposals" or "3 of 4 proposals." And, Tannenbaum notes, it would have been illogical and incoherent to instruct him to vote "yes" on one leg of the Proposed Merger, but vote "no" or abstain on the other, *i.e.*, to vote in favor of the merger in his capacity as an OCSL shareholder but not do so in his capacity as an OCSI shareholder, or vice versa. That is because an adverse shareholder vote on either the OCSL or the OCSI leg of the Proposed Merger would have thwarted it. Pl. Counter 56.1 ¶ 28; Joint Proxy Mat. at 120–21. Thus, Tannenbaum urges, Pendo's instruction can only logically be viewed as presenting the Proposed Merger as a single proposal, which happened to require "yes" votes from Tannenbaum in his capacity as both an OCSL shareholder and an OCSI shareholder. Def. SJ Mem. at 14. And, Tannenbaum attests, that is how he understood Pendo's instruction. Tannenbaum Decl. ¶¶ 13–15.

On this issue, summary judgment is in order for Tannenbaum. Plaintiffs' argument is based solely on a semantic construction of Pendo's email to Tannenbaum. But even on its own terms, that reading is shaky. The email refers to three proposals, not three votes, and the Merger is quite convincingly understood as a single proposal, even if it required separate affirmative votes from the two shareholder constituencies. And the email commands "yes" votes on "all" proposals, not some, or "3 of 4." And the one percipient participant in the email from whom

plaintiffs elected to seek testimony, Tannenbaum, unequivocally attested that the "3 proposals" included, as a single proposal, the vote (whether from the OCSL or OCSI perspective) on the Merger.

As developed in discovery, the surrounding circumstances support this understanding, for three independent reasons. First, OCSI and OCSL consistently and jointly pitched the proposed Merger to their shareholders, in coordinated fashion, as a single proposal. The October 29, 2020 Press Release announcing the proposed Merger was issued by both entities; the investor conference call on October 29, 2020 was open to shareholders from both; and the January 21, 2021 Joint Proxy Materials were issued by both entities and sent in identical versions to OCSI and OCSL shareholders. As pitched, both sets of shareholders, from OCSI and OCSL, stood to benefit from the Merger. Press Release at 1–3. And a major—if not the driving—force behind the proposed Merger was Pendo, president and COO "of all the Oaktree entities." Pl. SJ Mem. at 10. The proposed Merger was, thus a single idea—a single proposal—addressed to the two sets of shareholders which formally had to bless it in separate votes.

Second, it would have been illogical from Oaktree's perspective to instruct Tannenbaum, the largest single shareholder in OCSI and OCSL, and whose votes were at Oaktree's disposal, to vote in favor of one necessary leg of the Merger, but leave him free to vote against the other. As Oaktree's President and COO, Pendo represented the interests of Oaktree. Oaktree had engineered the Merger. Pendo, on Oaktree's behalf, was "thrilled to announce this merger," and had openly touted his support for it and its virtues. Press Release at 1. And the Proposed Merger was more important to Oaktree than the other proposals before the OCSL shareholder electorate: to elect two new OCSL directors and ratify the selection of an independent auditor. From Oaktree's perspective as the entity empowered to control Tannenbaum's vote, it would have

been nonsensical to conceive of the Proposed Merger as two separate proposals on which its recommendation could differ, or to view the instruction to vote in favor of "all 3 proposals" as leaving Tannenbaum free to vote no or abstain on the Proposed Merger in one of his capacities.

Third, it would have been illogical from *Tannenbaum*'s perspective to view Pendo's email as leaving him free to vote no on one leg of the proposed Merger. And contemporaneous evidence refutes this scenario. Robyn Tannenbaum's February 8 email to Pendo, preceding his email to her, stated: "We have received [Tannenbaum]'s control numbers to vote his shares *in the merger*. Per our voting agreement, please let us know how you would like us to vote." February 8 Emails (emphasis added). Pendo replied: "Please vote in favor of all 3 proposals." *Id.* Robyn Tannenbaum's query plainly referred to a single Merger, without distinguishing between Tannenbaum's capacity as an OCSL shareholder and his capacity as an OCSI shareholder. Pendo's reply referring to "all 3 proposals" left that assumption undisturbed. To treat his reference to "all 3 proposals" as instructing Tannenbaum to vote in favor of the Director Proposal and the Auditor Proposal—not even explicitly discussed in the February 8 Emails—but to vote potentially in offsetting fashion on the key proposal before each electorate and about which Robyn Tannenbaum had explicitly inquired defies common sense.

On the evidence adduced, a reasonable factfinder could not so construe Pando's email instruction, other than by sheer speculation. The direct and circumstantial proof convincingly establishes that Pendo directed Tannenbaum to vote in favor of the Merger in his capacities as both an OCSL and an OCSI shareholder. And thus, Tannenbaum's acquisition of OCSL stock pursuant to the Merger-induced stock exchange was involuntary. His contractual obligation to vote his shares in both legs of the Proposed Merger, triggered by Pendo's written instruction, left him no "degree of control over [the] transaction," *Sprague Elec. Co.*, 488 F. Supp. at 845. He

had, in the language of the caselaw, an "utter inability . . . to control the course of events,"
*Heublein*, 559 F. Supp. at 699 (quoting *Am. Standard*, 510 F.2d at 1054).[13]

Plaintiffs make three arguments why, even if Oaktree instructed Tannenbaum how to
vote on both legs of the Proposed Merger, his acquisition of OCSL shares was not involuntary.
None are persuasive.

Plaintiffs first argue that Tannenbaum, in selling his controlling interests in OCSL's and
OCSI's predecessor companies to Oaktree in 2017, could have reasonably foreseen the Merger.
MTD Opp'n at 8–9. But as a basis for § 16(b) liability, that argument fails for two reasons.
First, Tannenbaum's sale of his interest in Fifth Street Senior and Fifth Street Finance, OCSI's
and OCSL's predecessors to Oaktree, long preceded § 16(b)'s six-month window. Tannenbaum
entered into the APA on July 13, 2017 and concluded the sale in October 2017. OCSL and OCSI
did not enter into their Merger Agreement until October 28, 2020, and the Merger did not
conclude until March 19, 2021. *See Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 423
(1972) ("[A] 'plan' to sell that is conceived within six months of purchase would not fall within
§ 16(b) if the sale were made after the six months had expired[.]").

Second, "[s]ophisticated speculation as to the probable reactions of another" does not
equate to "the ability to exert control over those reactions. Acquisitions based upon such

---

[13] Plaintiffs' speculation that Tannenbaum could affect the "[f]ruition or [t]iming" of the Merger
lack record support, as both are based on the false premise that Pendo had left him free to decline
to vote in favor. *See* Pl. SJ Mem. at 21–22. Courts applying *Kern County* and its progeny have
found involuntariness on facts far less clear-cut than here: for example, where a company,
thwarted in its bid to amass influence over the target company due to the target's defensive
measures, either voted against the merger, *Heublein*, 559 F. Supp. at 695, 699–700, *Colan v.
Prudential-Bache Sec., Inc.*, 577 F. Supp. 1074, 1080, 1082–83 (N.D. Ill. 1983), or abstained,
*Kern Cnty.*, 411 U.S. at 599. In those cases, the § 16(b) defendant was still free to vote its shares
as it wished, despite its inability to affect the outcome. Here, in contrast, Tannenbaum had no
such leeway, in that his vote was literally dictated by Pendo.

speculation are not among the evils § 16(b) is designed to prevent when engaged in by those without inside information about the issuer." *Heublein*, 559 F. Supp. at 700. Some courts have declined to find involuntariness where the defendant (1) could have foreseen the unorthodox transaction and (2) retained some measure of control over that transaction. *See, e.g.*, *Makofsky v. Ultra Dynamics Corp.*, 383 F. Supp. 631, 642–43 (S.D.N.Y. 1974) (transaction not involuntary where insider gave up control to a third party, thus "put[ting] its own head in the lion's mouth, [but] retained at leas[t] some power to get out of it"); *Leone*, 702 F. Supp. at 1138; *Alloys Unltd. v. Gilbert*, 319 F. Supp. 617, 619 (S.D.N.Y. 1970); *Oliff v. Exch. Int'l Corp.*, 449 F. Supp. 1277, 1294 (N.D. Ill. 1978). But here, plaintiffs do not point to evidence suggesting that Tannenbaum *could* have foreseen OCSI's merger into OCSL three years later. And as the Court has held, under Pendo's instructions, Tannenbaum lacked any influence over the Merger.

Plaintiffs next argue that Tannenbaum, in selling to Oaktree his controlling interest in OCSL's and OCSI's predecessors, created circumstances in which he was ultimately "forced" into a transaction that benefited him. This concerted move, plaintiffs aver, disentitles him from the right to invoke the unorthodox transaction exception. Pl. SJ Mem. at 24. That, too, is wrong. Plaintiffs liken Tannenbaum to a principal who cedes his voting rights to a trusted friend who can be counted on to vote in favor of the principal's interests. *See, e.g.*, *id.* at 6–9. A line of cases invoking the "lion's mouth" doctrine has indeed found retention of voluntariness where an insider formally ceded authority to a third party to influence a transaction, but retained a lifeline to reactivating its authority. *See Colan*, 951 F.2d at 1522; *Alloys Unltd.*, 319 F. Supp. at 619; *Makofsky*, 383 F. Supp. at 642. On the evidence adduced here, however, Tannenbaum did not retain such a lifeline.

Third, plaintiffs imply that because Tannenbaum's wife contacted Pendo, as opposed to vice versa, Tannenbaum solicited the voting instruction, and thereby "sought to surrender his independent right to scuttle the merger." Pl. SJ Mem. at 19–20. That argument is a *non sequitur*. Whether instruction was initiated by Pendo or delivered after an inquiry, Pendo's instruction contractually obligated Tannenbaum as to how to vote.[14]

There is, therefore, no material dispute of fact as to involuntariness. Tannenbaum's acquisition of OCSL shares pursuant to the stock exchange that followed OCSI's Merger into OCSL was involuntary.

### 3.     Access to Exploitable Inside Information

To avoid liability in the context of an unorthodox transaction, a defendant insider must also show that he "ha[d] no access to inside information." *Analytical Survs., Inc.*, 684 F.3d at 46. Where there is even "the possibility" of speculative abuse of inside information, "[s]ection 16(b) should be applied without further inquiry." *Huppe*, 670 F.3d at 219 (quoting *Blau v. Lamb*, 363 F.2d 507, 519 (2d Cir. 1966)). "[T]en percent holders can be presumed to have access to inside information because they can influence or control the issuer as a result of their equity ownership." *Huppe*, 670 F.3d at 219 (internal quotation marks and citation omitted); *accord Am. Standard*, 510 F.2d at 1055.

This presumption, however, can be rebutted, as the pragmatic analysis invites a concrete "examination of the opportunities for speculative abuse inherent in particular unorthodox situations." *Heublein*, 559 F. Supp. at 703. Where the insider does not have "access to *material*

---

[14] As discussed, *supra*, plaintiffs at the October 12, 2021 conference reserved the right to attempt to establish that the Voting Agreements were invalid, and to argue on that basis that Tannenbaum's votes were not controlled. Conf. Tr. at 34–38. Plaintiffs have not pursued that argument at summary judgment.

information that he might be able to exploit his advantage to the detriment of the general investing public," his information by definition is not "significant to an investment decision, and therefore it could not afford an opportunity for speculative abuse." *Id.* at 704 (emphasis added). As such, "under the pragmatic approach, . . . the actual facts of a transaction figure significantly in determining whether the provision applies." *Portnoy v. Seligman & Latz, Inc.*, 516 F. Supp. 1188, 1200 (S.D.N.Y. 1981); *see also Tinney v. Geneseo Commc'ns, Inc.*, No. 03 Civ. 1126 (SLR), 2005 WL 8170599, at *3 (D. Del. Mar. 21, 2005) ("[T]he pragmatic analysis, as dictated by the Supreme Court, is fact specific."). In this analysis, non-public information does not qualify as disqualifying inside information where its disclosure would amount to "recitation of the obvious." *Raybestos-Manhattan, Inc. v. Hi-Shear Indus., Inc.*, 503 F. Supp. 1122, 1131 (E.D.N.Y. 1980).

Here, Tannenbaum undisputedly was a statutory insider by virtue of his more than 10% beneficial ownership, at all relevant times, of OCSL stock. To rebut the presumption that he had access to inside information, Tannenbaum notes that the Voting Agreements bar him from even attempting to influence or control OCSL's/OCSI's management or policies, OCSL VA § 2.07(b); OCSI VA § 2.07(b). And he notes, the contractual scheme as a whole was designed to wall him off from inside information. Def. SJ Mem. at 19–20. He also points to his deposition testimony. There, he testified without refutation that he did not learn of the proposed Merger until it was publicly announced. It was only then that he called Pendo to "walk [him] through how" both companies' NAVs would be calculated. Tannenbaum Dep. Tr. at 48, 51. That information, in turn, Tannenbaum testified, was derived solely from the documents that had been publicly released about the transaction. Finally, he attests, he and Pendo were mindful of insider trading rules and were "careful" in their call not to overstep. *Id.* at 48, 51.

Plaintiffs have not mustered any concrete evidence rebutting this showing.  But they make three arguments that they have adduced a triable issue of fact as to whether Tannenbaum, by virtue of his insider status, had potential access to information he could have exploited in his acquisition of OCSL shares pursuant to the Merger.

First, plaintiffs posit that Tannenbaum's phone call with Pendo, on or about November 1, 2020, may have given Tannenbaum advance non-public knowledge of how the stock exchange ratio would be calculated before its ultimate announcement on March 19, 2021.  Tannenbaum, plaintiffs posit, obtained that knowledge by discussing the method by which both OCSI and OCSL would calculate their respective NAVs.  This, in turn, plaintiffs state, would have given Tannenbaum the opportunity to exploit this information—by, for example, selling over-valued shares that after Merger would be available at a lower price, or buying under-valued shares that, after the Merger, could be sold at a premium.  Pl. SJ Mem. at 11.

The scenario plaintiffs imagine fails to win them relief because, even assuming that Tannenbaum obtained some unspecified non-public information on this topic in his call with Pendo, it was immaterial in light of the comprehensive information about the exchange ratio that had already been publicly disclosed.  It is undisputed that (1) the stock exchange ratio would be based on the ratio of OCSI's and OCSL's NAVs; (2) that ratio would be determined based on the two funds' NAVs calculated within 48 hours of the stockholders' approval of the Merger; and (3) as reflected in the contemporaneous Press Release, both of these pieces of information had been made public on October 29, 2020, when the Merger was announced.  That day, OCSI and OCSL also used the Press Release to illustrate the stock exchange ratio—1.39 OCSL shares per OCSI share—that would apply based on the funds' NAV ratio as of June 30, 2020.  It is also undisputed that, nearly three months later, the funds publicized, in their Joint Proxy Materials, a

refreshed illustration of the stock exchange ratio, using as inputs the funds' more recent NAVs of December 30, 2020. These inputs yielded a ratio of 1.37 OCSL shares per OCSI share. Dkt. 63-5 at 32.

In these circumstances, investors had all pertinent information they needed: the NAV-based formula that would be used to set the eventual stock exchange ratio, and, to the extent concrete illustrations were needed as an explanatory tool, the ratio that would be yielded, both four months and then two months before the Merger, by using as inputs the stocks' then-current NAVs.[15] The only information unknown to the public was what the stocks' NAVs would be in the period 48 hours before the Merger, and that figure was inherently unknowable. Tannenbaum "thus had no opportunity over and above that of any other stockholder to take advantage of any 'advance knowledge of information that would produce a rise in the market price' of [OCSI] stock or of [OCSL] stock. . . . He participated in the merger on exactly the same basis as all other stockholders." *Gold v. Sloan*, 486 F.2d 340, 346–47 (4th Cir. 1973) (citing *Roberts v. Eaton*, 212 F.2d 82, 85 (2d Cir. 1954)).

Plaintiffs nonetheless declare that Tannenbaum had an "edge in forecasting" the stock exchange ratio by virtue of his "direct line" to Pendo and his November 1, 2020 "Q & A session not open to the public." Pl. SJ Mem. at 10–11. That access, plaintiffs posit, could have enabled Tannenbaum to better predict the final exchange ratio *before* it would be publicly announced, and to take advantage of such advance knowledge. *Id.* That claim, however, is too speculative to raise a triable issue of fact precluding summary judgment. Plaintiffs have not adduced any

---

[15] The eventual ratio proved to be 1.3371, slightly below both of the ratios earlier calculated for illustrative purposes. *See* Press Release at 1 (1.39 on October 29, 2020); Dkt. 63-5 at 32 (1.37 on February 4, 2021).

evidence that Tannenbaum obtained information, on November 1, 2020 or at any other time, that gave him an early jump in predicting what the NAV inputs would be immediately prior to shareholder approval in mid-March 2021.[16]   Plaintiffs therefore have not raised a triable of issue of fact on whether Tannenbaum had access to insider information "that he might be able to exploit . . . to the detriment of the general investing public" or otherwise had "an opportunity for speculative abuse." *Heublein*, 559 F. Supp. at 704.   Plaintiffs' "naked assertion that certain meetings took place," without any evidence of problematic content, does not carry their burden on summary judgment. *Colan v. Prudential-Bache Sec., Inc.*, 577 F. Supp. 1074, 1083–84 (N.D. Ill. 1983) (finding no potential access); *Portnoy*, 516 F. Supp. at 1200 (same, based on merely "speculative potential for speculative abuse").

Plaintiffs next argue that Oaktree's voting instruction to Tannenbaum itself constituted exploitable inside information. Pl. SJ Mem. at 12.  This instruction, given in the February 8 email from Pendo, read in its entirety: "Robyn, Thanks for reaching out.  Please vote in favor of all 3 proposals.  Thanks.  Matt."  This instruction was given after the Joint Proxy Materials had been filed on January 21, 2021, and disclosed that no beneficial owners of more than 5% of OCSI's or OCSL's stock had yet been instructed to vote in favor of the Merger.  Plaintiffs argue that the February 8 Emails allowed Tannenbaum to predict that his vote would ensure that the Merger would be approved and to take advantage of that knowledge by selling his OCSL shares early. *Id.* at 13–14; *see also* Joint Proxy Mat. at 104–05, 107.

---

[16] Although not necessary to this decision, plaintiffs have not established that the method of calculating NAVs was inaccessible to the public.  In all events, there is no evidence that Tannenbaum was privy to any publicly unavailable methodology.  The sole relevant testimony on this point is that, after his call with Pendo, which posted the public disclosure of the method by which the stock exchange ratio would be tabulated, Tannenbaum consulted publicly available investor reports to check for "discrepancies."  Tannenbaum Dep. Tr. at 51.

That is wrong for two reasons. First, Tannenbaum was not in position to safely predict the success of the Merger based on his own vote. At the time of the vote, he beneficially owned 13% of OCSL's shares and 21.6% of OCSI's shares. Although sizeable, these holdings did not assure that a majority of all OCSL votes cast, or that a majority of all outstanding OCSI shares, would vote in favor of the Merger. *See* Joint Proxy Mat. at 105. Plaintiffs note that, in fact, Tannenbaum's vote of his approximately 6.36 million OCSI shares proved "decisive" in approving the OCSI leg of the Merger because, without his votes, less than half of OCSI's shares would have voted for its approval. Pl. 56.1 ¶ 31.[17] But Tannenbaum could not have predicted this *ex ante*. Oaktree's voting instructions did not give Tannenbaum an "exploit[able] . . . advantage to the detriment of the investing public," *Heublein*, 559 F. Supp. at 704.

Second, and more important, although the emailed instruction to Tannenbaum was not itself publicly available, that the company would instruct him to vote in favor of the Merger was an "obvious" point—the formalization of which did not amount to inside information. *See Raybestos-Manhattan*, 503 F. Supp. at 1131 ("recitation of the obvious" is not required); *Richland v. Crandall*, 262 F. Supp. 538, 554 (S.D.N.Y. 1967) ("[C]orporations are not required to address . . . stockholders as if they were children in kindergarten"). Here, the investing public knew two facts that made it obvious that Tannenbaum would be so instructed. First, Oaktree expressly supported—indeed, it had engineered—the Merger between OCSI and OCSL. *See* Joint Proxy Mat. at 2; Borchardt Decl. Ex. 3 at 2–3. Second, the Voting Agreements setting out Oaktree's authority to direct Tannenbaum's votes at OCSI and OCSL shareholder meetings, too,

---

[17] As noted, approximately 18.9 million of OCSI's approximately 29.5 million shares voted for the Merger. Subtracting Tannenbaum's 6.36 million votes, only approximately 12.6 million votes—short of a majority—would have voted to approve. Pl. 56.1 ¶ 31; Def. Counter 56.1 ¶ 31.

were public. *See* OCSI VA; OCSL VA. It took but a tiny step to infer that Oaktree would so

exercise this authority to direct Tannenbaum to vote for the Merger. *See Diamond v. Arend*, 649

F. Supp. 408, 416 (S.D.N.Y. 1986) ("McGregor, in the context of announcing to Faberge

shareholders the Merger Agreement and the commencement of its tender offer, disclosed the

agreements in question. Any reasonable shareholder would realize that McGregor and Faberge

acceded to those agreements in order to motivate the other party to enter into the Merger

Agreement. The Court will not require McGregor to restate the obvious.").

Plaintiffs' third—and most adventurous—argument is that Tannenbaum had access to

inside information by virtue of giving Oaktree control of his vote. *See generally* Pl. SJ Mem. at

6–9. Plaintiffs' theory appears to be that, by putting his voting power at the disposal of Oaktree,

Tannenbaum developed a unity with Oaktree under which its insider knowledge can be imputed

to him.[18] Plaintiffs reprise this theory in different form by casting Tannenbaum's entry into the

Voting Agreements as a long-term gambit to escape the reach of § 16(b). *Id.* at 18–19.

---

[18] In this vein, plaintiffs offer a contorted analogy to a horse racing scenario, in which a bettor
hands money to a trusted but secretive sports gambler to bet on a "sure winner" in a horse race
about which the bettor knows nothing. The horse wins the race, and the bettor collects the
winnings in a seemingly "uncanny" stroke of luck. Plaintiffs liken Tannenbaum's ceding of his
right to control his interests in OCSI and OCSL to handing over money to a gambler to bet on a
rigged horse race. For multiple reasons, this analogy falls flat. Most important, the evidence
does not support any secretly rigged outcome—on the contrary, OCLS and OCSI publicly
endorsed the Merger and were publicly known to control Tannenbaum's vote. Second, unlike
the hypothetical bettor, Tannenbaum received consideration long ago for ceding his voting
authority, pursuant to the July 2017 APA. There is no evidentiary basis to suggest that he did so
in the secret expectation of extracting an insider benefit years later. Finally, there is no record
evidence that Oaktree, in voting for the Merger, did so as a "trusted friend" of Tannenbaum.
While Oaktree's interests may or may not align with Tannenbaum's, on the evidence at hand,
Oaktree's vote of Tannenbaum's shares was dictated by its determination of its (and its
shareholders) best interests.

That argument fails, for want of precedent or evidentiary support. Plaintiffs have not pointed to any case in which an insider shareholder's cessation of voting authority to an issuer has been held to create a unity in which the issuer's knowledge is imputed to the shareholder. And plaintiffs have not adduced evidence on which to infer such here, or to infer that Oaktree had committed to vote its shares to favor Tannenbaum's interests above those of shareholders generally.

The Court accordingly holds that plaintiffs have failed to raise a triable issue of fact that Tannenbaum had access to inside information that he could have exploited in connection with the OCSI–OCSL Merger.

Having found that Tannenbaum's acquisition of OCSL shares pursuant to the Merger was an unorthodox transaction and that the evidence adduced necessarily—and without any dispute of material fact—establishes both prongs of the *Kern County* test, the Court finds Tannenbaum's acquisition and sale of OCLS shares exempt from liability under § 16(b).

## CONCLUSION

For the foregoing reasons, the Court grants Tannenbaum's motion for summary judgment and denies plaintiffs' mirror-image motion. The Clerk of Court is respectfully directed to close the motions pending at docket numbers 45 and 61, and to close this case.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: April 25, 2022
      New York, New York