UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DENNIS DONOGHUE, *et al.*,

                                    Plaintiffs,

                    -v-

OAKTREE SPECIALTY LENDING CORPORATION,

                                    Nominal Defendant,

*and* LEONARD M. TANNENBAUM,

                                    Defendant.

---

21 Civ. 4770 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This case is before the Court on remand.  Plaintiffs Dennis Donoghue and Mark

Rubenstein, shareholders of Oaktree Specialty Lending Corporation ("OCSL"), bring suit under

Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), to recover alleged

short-swing profits obtained by a company insider, defendant Leonard M. Tannenbaum.

In an earlier decision, the Court granted summary judgment to Tannenbaum, holding that

no material issue of fact existed as to either prong of the "unorthodox transaction" exception to

Section 16(b), as (1) Tannenbaum's merger-related acquisition of OCSL shares was involuntary,

and (2) Tannenbaum did not have access to inside information related to the merger.  Dkt. 70

("2022 Op."), 600 F. Supp. 3d 463 (S.D.N.Y. 2022).  The Second Circuit, however, vacated and

remanded, holding that Tannenbaum was entitled to summary judgment as to the first prong of

the unorthodox transaction exception, but that he had not carried his burden as to the second.

Dkt. 74 ("2d Cir. Op."), 2023 WL 4631963 (2d Cir. July 20, 2023).

Pursuant to the Circuit's mandate, the Court reopened discovery for the limited purpose of further developing the evidentiary record as to whether Tannenbaum had had access to inside information related to the merger. With discovery now complete, Tannenbaum again moves for summary judgment. For the reasons that follow, the Court denies the motion.

## I.    Background[1]

### A.    Factual Background to the Merger

Given the limited scope of this decision, the Court offers here only a brief summary of the underlying facts, and incorporates by reference the comprehensive factual background provided in its earlier opinion. 2022 Op. at 2–10.

---

[1] The facts which form the basis of this decision are taken from the parties' pleadings and their submissions in support of and in opposition to the instant motion—specifically, the parties' joint stipulation of facts, Dkt. 102 ("JSF"); Tannenbaum's Rule 56.1 statement, Dkt. 106 ("Def. 56.1"); the declaration in support of the motion, plus attached exhibits, of Christopher Dioguardi, Dkt. 105 ("Dioguardi Decl."); plaintiffs' Rule 56.1 statement, Dkt. 115 ("Pl. 56.1"); plaintiffs' reply to Tannenbaum's Rule 56.1 statement, Dkt. 114 ("Pl. Reply 56.1"); the declaration in opposition to the motion, plus attached exhibit, of Miriam Tauber, Dkt. 113 ("Tauber Decl."); and Tannenbaum's reply to plaintiffs' Rule 56.1 statement, Dkt. 128 ("Def. Reply 56.1"). The Court also refers to the companies' joint proxy statement. Dkt. 46, Ex. 7 ("Joint Proxy Statement"). The Court draws on the depositions of Matthew Pendo, as a Rule 30(b)(6) representative of OSLC, Tauber, Decl., Ex. 12 ("Pendo 30(b)(6) Dep."), and in his individual capacity, *id.*, Ex. 13 ("Pendo Dep."); of Tannenbaum, in 2021, *id.*, Ex. 1 ("Tannenbaum 2021 Dep."), and 2023, *id.*, Ex. 2 ("Tannenbaum 2023 Dep."); and of Queena Ang, as a Rule 30(b)(6) representative of OSLC, *id.*, Ex. 3 ("Ang Dep.").

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

In October 2017, Tannenbaum sold his management interest—while retaining his significant equity interest—in two companies he founded to Oaktree Capital Management, L.P. ("Oaktree"). JSF ¶ 1. Upon the sale, the companies were rebranded as Oaktree Specialty Lending Corporation ("OSCL") and Oaktree Strategic Income Corporation ("OCSI"). *Id.* As part of the deal, Tannenbaum agreed to vote his OCSL and OCSI shares "at each meeting of the stockholders . . . in accordance with the written instruction" of Oaktree (the "Voting Agreements"). *Id.* ¶ 4; *see also* Dkt. 63, Exs. 3–4 (full text of Voting Agreements).

Three years later, on October 29, 2020, OCSL and OSCI jointly announced that OCSL would acquire 100% of OCSI in a stock-for-stock transaction (the "Merger"). *Id.* ¶ 7. Under the Merger, OCSI shareholders—like Tannenbaum—were to receive a number of shares in OCSL based on the relative net assets per share (the "Net Asset Value" or "NAV") of each company at the time the deal closed (the "Exchange Ratio"). *See id.* ¶¶ 8–9. To use a simple example, if OCSI's net assets per share (say, $8) were double OCSL's ($4) at the time the deal closed, each OCSI share would be converted into two OCSL shares, ensuring that each shareholder retained the same approximate "value" post-Merger. *See id.* ¶¶ 8–9. When the companies announced the Merger, they provided an "illustrative example" of the prospective Exchange Ratio based on each company's NAV as of June 30, 2020 (*i.e.*, based on each company's publicly disclosed results as of the end of Q2 2020). *Id.* ¶ 12. At that time, OCSI's NAV was $8.47 per share, and OCSL's NAV was $6.09 per share—which would lead to each OCSI share being converted into 1.39 OCSL shares (*i.e.*, $8.47 divided by $6.09). *See id.* ¶¶ 11–12.

Soon after the Merger's announcement, Tannenbaum spoke by phone with Matthew Pendo, a senior executive at OCSL and OCSI. Def. 56.1 ¶ 10. In the pre-remand record, only Tannenbaum had been deposed. 2022 Op. at 2 n.1, 6–7. In that deposition, he testified that he

called Pendo to determine whether he "was being hurt . . . [or] benefitted" by the Merger—specifically, by how the companies would calculate their NAVs. Tannenbaum 2021 Dep. 47, 50. He testified that Pendo, in response, "pointed towards different parts of the public release documents to walk [him] through" the method of calculation, *id.* at 48, and that the two were "careful" only to discuss public information, *id.* at 51. Further details as to this phone call are discussed below, based on the factual record developed on remand.

In February 2021, Tannenbaum, as instructed by Oaktree, voted his shares in favor of the Merger, which was approved by shareholders. *See id.* ¶¶ 15–16. The Merger closed in March 2021. *Id.* ¶ 17. The final Exchange Ratio, calculated based on each company's NAV at the time of the Merger, was 1.3371 OCSL shares for each OCSI share. *Id.* Between September 2020 and September 2021—the six months before and after the Merger—Tannenbaum sold OCSL shares in the open market at a profit of $1,076,049.86. *Id.* ¶ 20. Throughout that period, Tannenbaum beneficially owned more than 10% of OCSL's equity securities, such that he qualified as a statutory "insider" for purposes of Section 16(b). *Id.* ¶ 19.

### B. Early Procedural History and the Court's Summary Judgment Decision

On May 27, 2021, plaintiffs initiated this action under Section 16(b) to disgorge the short-swing profits realized by Tannenbaum before and after the Merger. Dkt. 1. After Tannenbaum filed a motion to dismiss, the Court held an initial pretrial conference, in which it converted Tannenbaum's motion to dismiss into one for summary judgment, authorizing limited discovery as to the applicability of the unorthodox transaction exception. Dkt. 39. On December 1, 2021, with discovery complete, both parties cross-moved for summary judgment. Dkts. 44–45.

On April 25, 2022, the Court granted Tannenbaum's motion for summary judgment and denied plaintiffs' cross-motion. 2022 Op. at 31. Section 16(b), the Court explained, creates "strict liability" for all corporate insiders—including those who own more than 10% of a corporation's equity—who purchase shares in that corporation and sell those shares within a six-month period. *Id.* at 13–15. However, the Court noted, under *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582 (1973), unorthodox transactions—transactions (1) that are involuntary and (2) about which the insider has no inside information—are exempt from liability under Section 16(b). 2022 Op. at 15–16.

The Court did not find a dispute of material fact as to either prong. As to the first, the Court held that the evidence conclusively established that the transaction was involuntary, because the Voting Agreements required Tannenbaum to vote his shares in favor of the Merger as directed by Oaktree. *Id.* at 17–24. As to the second, the Court held that the evidence conclusively established that Tannenbaum had not had access to inside information about the Merger. *Id.* at 24–31. The Court explained that even plaintiffs' best evidence—that Tannenbaum discussed with Pendo the rate of conversion for OCSL to OCSI shares—failed to raise a triable issue, because "even assuming that Tannenbaum obtained some unspecified non-public information," any such information "was immaterial in light of the comprehensive information about the exchange ratio that had already been publicly disclosed." *Id.* at 25–26. The Court accordingly held that Tannenbaum was entitled to summary judgment, and entered judgment in his favor. *See id.* at 31.

### C.     The Second Circuit's Decision

On July 20, 2023, reviewing the Court's decision *de novo*, the Second Circuit vacated and remanded. 2d Cir. Op. at 11.

"As to the first prong of the unorthodox transaction exception," the Circuit held, "we agree with the district court that Tannenbaum's Merger-related acquisition of OCSL shares was involuntary." *Id.* at 6. The Circuit rejected plaintiffs' two arguments as to the contrary. First, no reasonable factfinder could conclude that there was "any ambiguity" about the instructions Tannenbaum received from Oaktree as to how to vote his shares. *See id.* at 6–7. Instead, it was clear that Oaktree instructed Tannenbaum to vote in favor of the Merger, such that he had no choice, under the Voting Agreements, but to do so. *See id.* at 6–7. Second, the fact that Tannenbaum "freely entered into the Voting Agreements" did not bear on the voluntariness analysis, because "there is no evidence that Tannenbaum could have foreseen the Merger upon entering the Voting Agreements in 2017." *Id.* at 7.

The Circuit held, however, that there was a material issue of fact as to the second prong of the unorthodox transaction exception. *See id.* at 7–8. "[T]en percent holders can be presumed to have access to inside information," the Circuit explained, "because they can influence or control the issuer as a result of their equity ownership." *Id.* at 7 (quoting *Huppe v. WPCS Int'l Inc.*, 670 F.3d 214, 219 (2d Cir. 2012)). That presumption can be rebutted, the Circuit noted, if the insider "has no access to material information such that he might be able to exploit his advantage to the detriment of the general investing public." *Id.* at 7–8 (quoting *Heublein, Inc. v. Gen. Cinema Corp.*, 559 F. Supp. 692, 704 (S.D.N.Y.), *aff'd*, 722 F.2d 29 (2d Cir. 1983)). The Circuit held that Tannenbaum had failed to adduce evidence that "indisputably rebut[ted]" that presumption, finding his deposition testimony about his call with Pendo "ambiguous." *Id.* at 8. "Although Tannenbaum asserted that only public information was discussed during the call," the Circuit noted, "he also stated that Pendo walked him through 'how the NAV was being calculated.'" *Id.* Because Tannenbaum's testimony "did not further explain what he meant by

'how the NAV was being calculated,'" the Circuit concluded, "it could fairly be inferred from the present record that some aspects of the valuation methodology were nonpublic." *Id.* Thus, "given the vague nature of Tannenbaum's testimony, a reasonable factfinder could discern from the fact of the Pendo [c]all and its content that there was 'at least the possibility of speculative abuse of inside information.'" *Id.* at 9 (quoting *Huppe*, 670 F.3d at 219).

In remanding to enable additional discovery, the Circuit noted that "[i]t may be that additional evidence regarding the Pendo [c]all—including, potentially, further deposition of Tannenbaum—might conclusively show whether any material nonpublic information was discussed during the call." *Id.* at 10. Thus, "the most efficient course of action is to remand for the district court to reopen discovery . . . for the limited purpose of determining (1) whether Pendo and Tannenbaum discussed the NAV calculation methodologies, (2) whether those methodologies were in fact nonpublic, and (3) how, if at all, such methodologies were immaterial." *Id.* The Second Circuit's mandate, vacating and remanding, issued on August 11, 2023. Dkt. 74.

### D.    Post-Mandate Procedural History

On September 19, 2022, the Court held a conference to discuss a revised discovery plan, resolve preliminary disputes as to the scope of discovery, and set a schedule for a new round of summary judgment motions. Dkt. 83 (transcript). On October 2, 2023, the Court approved a revised case management plan and scheduling order. Dkt. 86. On November 17, 2023, fact discovery concluded. Dkt. 90.

On December 8, 2023, Tannenbaum moved for summary judgment, Dkt. 103, and filed a memorandum of law in support, Dkt. 104 ("Def. Br."). On December 28, 2023, plaintiffs

opposed Tannenbaum's motion. Dkt. 112 ("Pl. Br."). On January 17, 2024, Tannenbaum filed a reply. Dkt. 125 ("Def. Reply Br.").

### E.   Relevant Factual Record on Remand

On remand, the sole issue is whether a reasonable factfinder would be obliged to find that Tannenbaum, after his phone call with Pendo, lacked inside information relating to the Merger. *See* 2d Cir. Op. at 10 (remanding for "limited purpose of determining (1) whether Pendo and Tannenbaum discussed the NAV calculation methodologies, (2) whether those methodologies were in fact nonpublic, and (3) how, if at all, such methodologies were immaterial"). In recounting the evidence adduced in discovery, the Court focuses narrowly on the phone call and the NAV methodologies discussed therein.

### 1.   The Phone Call

On October 29, 2020, OCSL and OSCI filed Forms 8-K with the Securities and Exchange Commission ("SEC") announcing that OCSL would acquire 100% of OCSI in a stock-for-stock transaction. JSF ¶¶ 7, 9. Pursuant to OCSL and OCSI's strategic communication plan for the Merger, Pendo was scheduled to speak with Tannenbaum after the Forms 8-K were filed, and was given talking points adapted to that purpose. *See* Tauber Decl., Ex. 10 ("Communication Plan") at 3; *see also* Pl. 56.1 ¶¶ 20–22. The talking points note that the Merger will "reduce[] the relative number of shares that Len Tannenbaum holds of OCSI and provide[] him with a better opportunity to exit his investments." Communication Plan at 1.

Sometime after the Forms 8-K were filed, Pendo spoke with Tannenbaum over the phone. Pendo 30(b)(6) Dep. 23–24; Tannenbaum 2021 Dep. 47–48; Tannenbaum 2023 Dep. 21. Pendo testified that he did not "recall when exactly [he] called [Tannenbaum]," except that he "definitely" did not call before October 28, 2020, "[b]ecause I wouldn't have called him before

the 8-K was filed." Pendo 30(b)(6) Dep. 23–24.  Tannenbaum recalled learning about the

Merger based on a press release issued on October 29, 2020.  He testified that he spoke to Pendo

"[a]fter [he] noticed that the companies were merging."  Tannenbaum 2023 Dep. 21; *see also*

Tannenbaum 2021 Dep. 48 (testifying that he spoke with Pendo "[t]he following day after [he]

saw . . . on my Bloomberg that this merger was happening").  On either timeline, the call

occurred on or after October 29, 2020.

     In his initial deposition, Tannenbaum testified that he spoke with Pendo over the phone

"[a]fter [he] noticed the companies were merging."  Tannenbaum 2021 Dep. 47.  He asked

Pendo "how the NAV calculations were being calculated for the merger between OCSI and

OCSL[,] because [he] was a larger shareholder on a percentage basis in OCSI and OCSL[] and

[he] wanted to try to ascertain if [he] was being hurt by this, if [he] was being benefitted." *Id.*

Tannenbaum testified that he "had no idea economically how it would affect [his] different

holdings," so he "went over that" with Pendo, who "pointed towards different parts of the public

release documents to walk [him] through how the NAV was being calculated and how ultimately

the mergers' NAV would be calculated." *Id.* at 47–48.  In his post-remand deposition,

Tannenbaum clarified that the only topic he discussed with Pendo was "why [the Exchange

Ratio] was illustrative."  Tannenbaum 2023 Dep. 32.  "[T]he problem" he had with the slide in

the investor presentation was that "it says illustrative example[,] and it doesn't say when the

NAV per share is [calculated]." *Id.* at 33.  He testified that he didn't believe the slide "properly

explains it." *Id.*  "What [he] learned from Matt Pendo" over the phone was that "the NAV was

actually [to be] calculated months later before the [M]erger," such that the illustrative Exchange

Ratio "wasn't the actual NAV." *Id.*  He denied that he ever discussed "any material nonpublic

information about OCSI or OCSL or the contemplated merger" with Pendo, *id.* at 55, and that he

ever discussed "anything about the NAV calculation methodologies that were used by OCSL or OCSI to calculate their NAV," *id.* at 55–56.

Pendo testified similarly to Tannenbaum about the substance of their phone call. He testified that he reviewed with Tannenbaum "the information that was in the investor deck that we prepared for all the investors . . . [o]r included in the 8-K." Pendo 30(b)(6) Dep. 25. Pendo could not recall whether Tannenbaum told him "that he was trying to ascertain whether he was being hurt or benefitted" from the Merger, *id.* at 30, whether Tannenbaum "had any questions based on" the investor deck, *id.* at 31, or whether Tannenbaum asked him any questions he could not answer due to insider trading compliance, *id.* at 34. He testified that he reviewed drafts of valuation reports prepared in connection with the Merger before his call with Tannenbaum, *id.* at 32–33, and had been told by counsel that he could not discuss the content of those reports, *id.* at 34. On questioning by Tannenbaum's counsel, Pendo denied ever revealing to Tannenbaum "any material nonpublic information" relating to OCSL or OCSI or the Merger, Pendo Dep. 24–25, or that he conveyed to Tannenbaum "any information at all that was not already in the public domain or disclosed publicly about the NAV calculation methodologies used by" OCSL or OCSI, *id.* at 25.

## 2. The NAV Methodologies

As part of the Merger, each OCSI shareholder was to receive a number of OCSL shares. JSF ¶ 7. The Exchange Ratio—that is, the conversion rate of pre-Merger OCSI shares to post-Merger OCSL shares—was not fixed at the time the companies announced the Merger in October 2020. *See id.* ¶¶ 8–9. Instead, the Exchange Ratio was to be based on each company's relative NAV per share at the time the deal closed. *See id.*

As to the calculation of each company's NAV, and the Exchange Ratio generally, the Forms 8-K provided that "no earlier than 48 hours" prior to the Merger, "OCSI and OCSL will deliver to the other a calculation of its net asset value as of such date," based on "a pre-agreed set of assumptions, methodologies and adjustments." *Id.* ¶ 9. "Based on such calculations," the Forms 8-K stated, "the parties will calculate the 'OCSI Per Share NAV,' which will be equal to (i) the Closing OCSI Net Asset Value divided by (ii) the number of shares of OCSI Common Stock issued and outstanding as of the Determination Date (excluding any Cancelled Shares), and the 'OCSL Per Share NAV,' which will be equal to (A) the Closing OCSL Net Asset Value divided by (B) the number of shares of OCSL Common Stock issued and outstanding as of the Determination Date." *Id.* The Forms 8-K stated that "[t]he 'Exchange Ratio' will be equal to the quotient (rounded to four decimal places) of (i) the OCSI Per Share NAV divided by (ii) the OCSL Per Share NAV." *Id.*

The press release announcing the Merger provided an "illustrative example" of the Exchange Ratio based on each company's NAV as of June 30, 2020—that is, at the end of Q2 2020. *Id.* ¶ 12. The companies' June 30, 2020 NAVs had previously been publicly disclosed in their Forms 10-Q, *id.* ¶ 11, as had the methodologies used to calculate the companies' NAVs, *id.* ¶ 10. The illustrative example explained that OCSI's NAV, as of the end of Q2 2020, was $8.47 per share, and OCSL's NAV was $6.09 per share. *See id.* ¶ 11. If such NAVs held through the Merger's closing, each OCSI share would be converted into 1.39 OCSL shares. *See id.* ¶¶ 11–12.

Queena Ang, senior vice president in Oaktree's pricing and valuation group as of the Merger, also testified—as a Rule 30(b)(6) witness for OCSL—about the methodologies used to calculate each company's NAV. The "pre-agreed set of assumptions, methodologies and

adjustments" referred to in the Forms 8-K, she stated, consisted of "our valuation methodology"
that Oaktree's pricing and valuation group "ha[d] previously discussed with both boards." Ang
Dep. 22. She explained this methodology as follows:

> So just to take a step back, we perform valuation services for the funds on a
> quarterly basis. And we have preset methodologies depending on the type of asset.
> So if an asset has a readily available price, then we typically use pricing vendors
> such as Markit to price the security. And those tend to be fairly straightforward.
> It's really just taking the average of the bid and the ask as given by our pricing
> vendors.
>
> For fair value securities, meaning . . . assets that do not have readily observable
> prices, we basically will have a valuation model, either internal or external, for the
> asset. And typically we would do a market approach for the underlying enterprise
> to figure out coverage, meaning we want to make sure that our bet is covered by,
> you know, the value of the business.
>
> And then we would do a discounted cash flow model where we would model the
> terms of the debt. Meaning we would model interest payments, . . . amortization
> payments, any exit fees, and then we would discount it using a discount rate that is
> based on a market yield.
>
> And then typically for performing loans we would send it out to external valuation
> firms like Duff & Phelps and Houlihan Lokey once a year. And all nonperforming
> loans that are not marked using a discounted cash flow would be sent out on a
> quarterly basis.

*Id.* at 22–24. When asked why Oaktree used a special valuation for the Merger, and not the most
recent quarterly valuation, Ang explained that, by the time of the Merger, the quarterly valuation
would have been out of date. *Id.* at 27. "[T]he merger happened March 18th [2021,] and if we
had used the last available quarterly valuation, it would have been as of December 2020," and
thus "there might have been things that happened with underlying portfolio companies that
would not be captured." *Id.* But, she stated, the "assumptions, methodologies and adjustments"
used for the Merger valuation were "the same" as those used for the quarterly valuation. *Id.* at
28–29.

## II.   Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a

reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

### III.    Discussion

#### A.    Applicable Legal Framework

Section 16(b) provides in relevant part:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer . . . .

15 U.S.C. § 78p(b). Section 16(b) "was designed to prevent an issuer's directors, officers, and principal stockholders from engaging in speculative transactions on the basis of information not available to others." *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 173–74 (2d Cir. 2012) (internal quotation marks omitted). On the whole, the statute "operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition." *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320–21 (2d Cir. 1998).

Despite Section 16(b)'s broad scope, the Supreme Court has instructed courts to take a "'pragmatic' approach" in evaluating whether certain "'borderline' transactions"—"transactions not ordinarily deemed a sale or purchase," like a stock-for-stock merger—fall "within the reach of the statute." *Kern County*, 411 U.S. at 594 & n.26. To this end, the Circuit has recognized a "limited" exception to liability under Section 16(b). This "unorthodox transaction exception" applies only where (1) the transaction is an "involuntary transaction by an insider," and (2) that insider "ha[d] no access to inside information." *Huppe*, 670 F.3d at 218; *see also Blau v. Lamb*, 363 F.2d 507, 519 (2d Cir. 1966). To claim the exception, an insider must overcome the

presumption that he has access to "confidential information by virtue of [his] relationship to the issuer." *Am. Standard, Inc. v. Crane Co.*, 510 F.2d 1043, 1053 (2d Cir. 1974).

### B.    Application

As both parties acknowledge, the Second Circuit's decision in this case has narrowed the issues before the Court. The first prong of the exception—whether the transaction was involuntary—is disposed of by the Circuit's decision. As to that issue, the Circuit held that "Tannenbaum's Merger-related acquisition of OCSL shares was involuntary." 2d Cir. Op. at 6. Plaintiffs thus agree that the "question of involuntariness is no longer at issue." Pl. Br. at 1. The second prong of the exception—whether Tannenbaum had access to inside information—is left open by the Circuit's decision. *See id.* at 7–10. The purpose of remand, as framed by the Circuit, was to determine whether "additional evidence" could "conclusively" and "indisputably" show that no "material nonpublic information was discussed during the call" between Tannenbaum and Pendo. *Id.* at 9–10.

At this stage of the case, the parties' disagreement boils down to two issues. First, how much evidence must Tannenbaum, as the party with the burden of persuasion, adduce to succeed on summary judgment? Second, as measured against that standard, is Tannenbaum entitled to summary judgment? The Court considers these issues in turn.

### 1.    Tannenbaum's Burden

A summary judgment movant must show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the movant satisfies this initial burden, then the non-movant must respond with evidence to the contrary or he will lose. *See Celotex*, 477 U.S. at 322–23.

These "principles apply when either party moves for summary judgment." *United States v. Real Prop. Located at 3234 Washington Ave. N., Minneapolis, Minn.* (*"3234 Washington"*), 480 F.3d 841, 844 (8th Cir. 2007). But "where the moving party has the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (cleaned up). The courts of appeals have not settled on one precise locution to define a movant's burden in this respect. *Compare id.* at 1154 (evidence "must be so powerful that no reasonable jury would be free to disbelieve it"), *with Harnishfeger v. United States*, 943 F.3d 1105, 1116 (7th Cir. 2019) (evidence must be "so one-sided as to rule out the prospect of a finding in favor of the non-movant"), *with Lemaster v. Lawrence County*, 65 F.4th 302, 310 (6th Cir. 2023) (evidence must be "of such weight that no rational jury could disagree with it"), *with Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (evidence must "establish" all essential elements "beyond peradventure"), *with In re Buscone*, 61 F.4th 10, 28 (1st Cir. 2023) (evidence must be "conclusive").[2] In all events, to warrant summary judgment on an issue upon which he bears the burden of proof, a movant's evidence must be substantial.

When the critical evidence adduced by a summary judgment movant is testimonial, as here, an additional complication is present. As Learned Hand famously observed, "the carriage, behavior, bearing, manner and appearance of a witness—in short, his 'demeanor'—is a part of the evidence" at trial, and it is "abundantly settled" that a jury should "take into consideration the

---

[2] The Second Circuit has not settled on a standard of its own. But the language used in the Circuit's mandate to this Court in this case—stating that Tannenbaum must "conclusively" and "indisputably" prove his case to be entitled to summary judgment, 2d Cir. Op. at 9–10—accords with these formulations.

whole nexus of sense impressions which they get from a witness" in determining whether to credit (or discredit) his testimony. *Dyer v. MacDougall*, 201 F.2d 265, 268 (2d Cir. 1952); *see also Purcell v. Waterman S.S. Corp.*, 221 F.2d 953, 954 (2d Cir. 1955) (per curiam). Thus, notwithstanding that a witness has testified to a fact, a jury might not credit that testimony. When the witness is a party with a personal interest in the lawsuit, a jury may have an additional basis to view such testimony with skepticism. *See United States v. Abel*, 469 U.S. 45, 52 (1984) ("[p]roof of bias is almost always relevant" as it "bear[s] on the accuracy and truth of a witness's testimony" and the likelihood that the witness has "slanted or perhaps fabricated" his statement of events). Whether it is realistically plausible that a jury would discredit an impeachable witness's testimony on a disputed point can be problematic for a court to assess with assurance on a cold summary judgment record, particularly as the impressions of "sight and sound" on which a jury might rely are not accessible to the Court. *Purcell*, 221 F.3d at 954.

In its decision in *3234 Washington*, 480 F.3d 841 (8th Cir. 2007), the Eighth Circuit thoughtfully addressed such issues. The Government there sought civil forfeiture of a clubhouse that the Hell's Angels had allegedly used to facilitate narcotics offenses. The Government bore the burden of establishing by a preponderance that there was a "substantial connection" between the property (the clubhouse) and the offense (drug trafficking). *See id.* at 842–43. The district court granted summary judgment to the Government based largely on the testimony of two cooperating witnesses who had previously pled guilty to federal drug offenses. *See id.* at 843. The Eighth Circuit reversed:

> The district court granted the government's motion for summary judgment on the ground that the [property owner's] evidence did not adequately refute the government's evidence of a substantial connection between drug trafficking and the clubhouse. . . . The court summarily rejected the [owner's] attack on the credibility of these government witnesses on the ground that a court must not weigh

17

the evidence or make credibility determinations in ruling on a motion for summary judgment.

We do not agree with this analysis. The burden of proof is particularly relevant when the party with the burden of proof moves for summary judgment and the opposing party presents evidence contesting the veracity of the movant's evidence. In this situation, if the testimony of a witness (as opposed to documentary evidence) is necessary to carry the movant's burden of proof, we look carefully at whether the witness is unbiased and competent, and whether his testimony is positive, internally consistent, unequivocal, and in full accord with the documentary exhibits.

If the movant makes this showing, then the opposing party cannot force a trial merely to cross-examine the witness or in the hope that something might turn up at the trial. But where specific facts are alleged that if proven would call the credibility of the moving party's witness into doubt, summary judgment is improper, especially when the challenged testimony is an essential element of the plaintiff's case. Indeed, if the credibility of a critical interested witness is even partially undermined in a material way by the non-moving party's evidence, summary judgment in favor of the party with the burden of proof should be denied.

*Id.* at 845 (quotation marks and citations omitted).

The Eighth Circuit's approach is sensible. It accords with the discussion of the First Circuit in a similar context. It recognized that a jury "may reject uncontradicted . . . testimony when it is improbable, inherently contradictory, riddled with omissions, or delivered in a manner giving rise to doubts," but required the opponent for summary judgment to point to "some affirmative evidence in the record" on which the witness's credibility might be discredited. *Quintana-Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62, 76 (1st Cir. 2002) (citing, *inter alia, Chesapeake & Ohio Railway Co. v. Martin* ("*C&O*"), 283 U.S. 209 (1931), and *Sonnentheil v. Christian Moerlein Brewing Co.*, 172 U.S. 401 (1899)). The Court applies that approach here.

### 2. The Post-Remand Record

Tannenbaum argues that he is entitled to summary judgment on the outstanding prong of the unorthodox transaction exception on two grounds. The evidence, he argues, conclusively establishes that (1) he was never told any material nonpublic information on his call with Pendo,

Def. Br. at 12–15, and (2) no material nonpublic information as to the Exchange Ratio existed at the time of the call, Def. Br. at 15–17.

   *a.* *Whether Pendo revealed material nonpublic information to Tannenbaum*

   Tannenbaum argues that the record conclusively establishes that he "had no access to inside information," 2d Cir. Op. at 6. He emphasizes that both he and Pendo have testified that their discussion was limited to publicly available information—that in the investor presentation attached to the Forms 8-K. On this basis, he argues, he has rebutted the presumption of access that the Second Circuit identified as a basis for remand. Def. Br. at 12–15.

   Applying the standards above, the Court concludes that—although the question is close—summary judgment is not available to Tannenbaum on this point. It is correct that Tannenbaum and Pendo have now squarely testified that they never discussed any nonpublic information over the phone or at any other time. *See* Pl. Br. at 12 (acknowledging the point). Questioned by plaintiffs' counsel, Pendo testified that the call consisted of Pendo "walk[ing]" Tannenbaum "through how the NAV was being calculated" by "read[ing] what was on the page in the investor deck." Pendo 30(b)(6) Dep. 31. And Tannenbaum similarly testified that Pendo "pointed [him] towards different parts of the public release documents," Tannenbaum 2021 Dep. 48, but that Pendo "[n]ever discussed . . . anything about the NAV calculation methodologies," Tannenbaum 2023 Dep. 55–56, but instead focused on "the timing of the exchange ratio," *id.* at 38. The factual record has thus sharpened since plaintiffs' appeal, in which the Circuit found the factual record "ambiguous" as to the nature of Tannenbaum and Pendo's discussion of "the valuation methodology" applied to determine each company's NAV, 2d Cir. Op. at 8. Pendo has clarified that this discussion was limited to the publicly available "investor deck." Pendo 30(b)(6) Dep. 25. And Tannenbaum and Pendo have now unequivocally denied ever discussing any material

nonpublic information.  Tannenbaum 2023 Dep. 55 (testifying that he never discussed with

Pendo "any material nonpublic information about OCSI or OCSL or the contemplated merger");

Pendo Dep. 24–25 (testifying that he never discussed with Tannenbaum "any information at all

that was not already in the public domain").  Were the finder of fact to credit Tannenbaum and

Pendo's testimony, Tannenbaum will indeed have established that he "had no access to inside

information that he could have exploited in connection with the Merger." 2d Cir. Op. at 7.

But summary judgment would be inappropriate in this case because, the Court finds, a

reasonable jury would have a basis on which to disbelieve Tannenbaum and Pendo's testimony.

*Cf. 3234 Washington*, 480 F.3d at 845 ("[W]here specific facts are alleged that if proven would

call the credibility of the moving party's witness into doubt, summary judgment is improper,

especially when the challenged testimony is an essential element of the plaintiff's case.").  Three

factors together counsel that conclusion.

First, Tannenbaum and Pendo have interests in the outcome of this case.  Tannenbaum, in

particular, as the defendant, stands to lose the $1,076,049.86 in profits he acquired as a result of

the implicated trades.  JSF ¶ 20.  And Pendo, an experienced executive in the financial services

industry, could see his professional reputation harmed were he to admit impermissibly sharing

inside information with Tannenbaum.  Such a revelation could also harm Pendo's employer.

"[I]nvestors likely would hesitate to venture their capital in a market where trading based on

misappropriated nonpublic information is unchecked." *United States v. O'Hagan*, 521 U.S. 642,

658 (1997).  Had Pendo overstepped in the conversation with Tannenbaum, even inadvertently,

he would have an incentive not to admit as much in his testimony. *Cf. Quintana-Ruiz*, 303 F.3d

at 76 (jury may properly reject testimony where witness has a "financial or personal interest in

the outcome of the case").

Second, although the bottom-line conclusions of Pendo and Tannenbaum's testimony—that non-public information was not shared on the phone call—align, aspects of each's testimony could be viewed as undermining each's credibility. Pendo could not recall arguably important aspects of the call; when asked whether Tannenbaum had posed "any questions during [the] call that" Pendo "could not answer because of insider trading compliance," Pendo testified, "I don't recall." Pendo 30(b)(6) Dep. 34. He also could not recall "how Tannenbaum reacted to" the information he conveyed; whether Tannenbaum gave him "any indication that he thought he was being hurt or benefited" by the Merger; or whether Tannenbaum had "any questions based on" the various documents he provided. *Id.* at 31. And a jury could view aspects of Tannenbaum's testimony as inconsistent. Tannenbaum initially testified that he had been "concerned and curious" about the Exchange Ratio, as "it's extremely hard to even think about" how to calculate the NAVs, "so we did have a conversation about what that meant." Tannenbaum 2021 Dep. 50. But in his second deposition, he testified that the conversation was essentially limited to "the timing of the exchange ratio," Tannenbaum 2023 Dep. 38, and was "relatively short," *id.* at 42. A reasonable jury could find these features of the participants' testimony unremarkable. But, viewing the evidence in the light most favorable to plaintiffs, such a jury could discount Pendo and Tannenbaum's testimony on account of material factual gaps (Pendo) or internal inconsistencies (Tannenbaum). *Cf. C&O*, 283 U.S. at 219–20 (examining whether an uncontradicted witness's testimony contains "equivocation, confusion, or aberration" (citation omitted)).

Third, Tannenbaum has not come forward with documentary evidence supporting his account. Neither participant took notes of the phone conversation. *See* Pendo Dep. 14 (Q: "[A]re you aware of any other documents or notes referring to your call with Mr. Tannenbaum?"

A: "No."); Tannenbaum 2023 Dep. 50 (Q: "[D]o you remember whether you took any notes or communicated by email about the call with anybody?" A: "No. No notes."). And the sole relevant document that does exist—the pre-call media plan and its Tannenbaum-specific talking points—although not addressing the issue, are compatible with plaintiff's theory. It notes that Pendo had topics to cover with Tannenbaum and did not cabin these to merely "walk[ing] him through" publicly available documents. Pendo 30(b)(6) Dep. 31; *see* Communication Plan at 1 (noting that the Merger will "reduce[] the relative number of shares that Len Tannenbaum holds of OCSI and provide[] him with a better opportunity to exit his investments"). The absence of corroboration is salient here, where the crucial disputed fact is "within the exclusive knowledge" of the two interested participants in the call. *Wilmington Tr. Co. v. Mfrs. Life Ins. Co.*, 624 F.2d 707, 709 (5th Cir. 1980); *see also Sonnentheil*, 172 U.S. at 409–10.

The Court thus concludes that a reasonable jury could reject Tannenbaum and Pendo's accounts on the disputed point. Were a jury to put aside these accounts, the record would be silent as to whether Tannenbaum received inside information on the call. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) ("[A]lthough the court should review the record as a whole [in ruling upon a motion for judgment as a matter of law], it must disregard all evidence favorable to the moving party that the jury is not required to believe."). And "[w]hen the record is silent[,] all turns on who ha[s] the burden of persuasion (better, the risk of non-persuasion) with respect to that point." *Pease v. Prod. Workers Union of Chi. & Vicinity Loc. 707*, 386 F.3d 819, 822–23 (7th Cir. 2004) (Easterbrook, J.). Here, Tannenbaum bears the "burden of showing that he had no access to material nonpublic information." 2d Cir. Op. at 9. Put another way, Tannenbaum bears the risk of non-persuasion as to that point. Because a reasonable jury could plausibly reject the testimony on which he relies, leaving him

without affirmative evidence to prove this element of his affirmative defense, summary judgment cannot be entered in Tannenbaum's favor on this ground.[3]

> b. *Whether material nonpublic information existed as to the Exchange Ratio*

Tannenbaum alternatively argues that the record establishes that the methodologies used to calculate each company's NAV had been publicly disclosed before his call with Pendo. He thus argues that there was no material nonpublic information for him to exploit, and thus no "possibility of speculative abuse," 2d Cir. Op. at 8, arising from his communications with Pendo. Def. Br. at 15.

That argument fails. Although aspects of the companies' NAV calculation methodologies were public, a reasonable jury could conclude that important aspects—in particular, as to the valuation of particular assets—were not. As Ang testified, for "assets that [did] not have readily observable prices," Oaktree had "valuation model[s], either internal or external," that it would use to determine its value. Ang Dep. 23. Unsurprisingly given their specialization in proprietary debt instruments, both companies held such assets. *Cf.* Joint Proxy

---

[3] The Court recognizes Tannenbaum's challenge in pursuing summary judgment on this defense, in that, "as a practical matter, it is never easy to prove a negative." *Elkins v. United States*, 364 U.S. 206, 218 (1960). But such was Congress's design in enacting Section 16(b), as the Supreme Court has recognized. *See Kern County*, 411 U.S. at 592 (describing Section 16(b) as a "flat rule" designed to "tak[e] the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great" (citation omitted)). Had it been plaintiffs' burden to prove that Tannenbaum had access to inside information, summary judgment for Tannenbaum would have been in order, because, as plaintiffs concede, they have not adduced affirmative evidence that Tannenbaum had access to inside information. Pl. Br. at 4–5. In that scenario, the fact that a jury could reject Tannenbaum and Pendo's testimony would not supply the necessary affirmative evidence to sustain plaintiffs' claim. "Juries can reject testimony, but doing so is not the same thing as evidence to the contrary," *Pease*, 386 F.3d at 822–23, so as to provide a basis "for drawing [the] contrary conclusion," *Bose Corp. v. Consumers Union*, 466 U.S. 485, 512 (1984).

Statement at 27 (both OCSL and OCSI are specialty finance companies providing "customized" and "innovative" credit and capital solutions). And the companies' Forms 10-Q acknowledged that the valuation of their Level 3 assets reflected only "management's best estimate," and entailed "judgment" and a consideration of "factors specific to the investment." Dioguardi Decl., Ex. 1 at 6–7 (OCSI); *id.*, Ex. 2 at 5–8 (OCSL); *see also In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d 105, 120 (S.D.N.Y. 2020) (Level 3 assets are "highly illiquid investments" and thus "entail[] the highest degree of subjectivity and difficulty in valuations"). Ang further testified that the models used to calculate the value of these assets would "change over time" based on "market data and financial data . . . at the time of the valuation." *Id.* at 85.

On this basis, a reasonable jury could find such information material, as knowledge of particular asset values "could have enabled an investor to better predict what the companies' NAV would be at the time of the [M]erger and, by extension, the [E]xchange [R]atio." 2d Cir. Op. at 9. And a reasonable jury could conclude that Pendo possessed such information at the time he spoke to Tannenbaum, given Ang's testimony, confirmed by Pendo, that Pendo had attended asset-valuation discussions related to the Merger. Ang Dep. 16; Pendo 13(b)(6) Dep. 32–33 (conceding that such meetings "could have" occurred before his call with Tannenbaum). As such, the record does not conclusively establish that Pendo lacked inside information at the time he spoke with Tannenbaum.

Tannenbaum thus has failed to come forward with evidence that, viewed in the light most favorable to plaintiffs, "indisputably" proves that "he had no access to material nonpublic information" related to the Merger, 2d Cir. Op. at 9.

## CONCLUSION

For the foregoing reasons, the Court denies Tannenbaum's motion for summary judgment. This case will now proceed promptly to trial. An order will issue shortly setting a deadline for the parties' joint pretrial order, to be completed consistent with the Court's Individual Rules governing jury trials. The Clerk of Court is respectfully directed to terminate all pending motions.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: June 20, 2024
New York, New York